Appellant was put to trial upon a two-count indictment which, omitting the formal parts, reads as follows:
"COUNT I
 "The Grand Jury of said County charge that before the finding of this Indictment, Wayne Cole, whose name is unknown to the Grand Jury other than as stated, unlawfully and with malice aforethought, killed Fayrene Wilson, by shooting her with a pistol;
"COUNT II
 "The Grand Jury of said County further charge that, before the finding of this indictment, Wayne Cole, whose name is unknown to the Grand Jury other than as stated, unlawfully, and with malice aforethought, killed Merita Cole, by shooting her with a pistol; against the peace and dignity of the State of Alabama."
At arraignment, in the presence of his counsel, he pleaded not guilty and not guilty by reason of insanity.
On January 2, 1975, appellant filed a written motion for a psychiatric examination but the record is entirely silent as to whether this motion was ever called to the attention of the Court and a ruling thereon invoked.
When the case was called for trial on January 14, 1975, appellant withdrew the pleas interposed at arraignment and filed the following plea:
 "THE STATE OF ALABAMA, PLAINTIFF VS. WAYNE COLE, DEFENDANT. CASE NO. ____
 "Comes now the defendant in the above styled cause and enters his plea of guilty to murder in the second degree to each Count and demands that a jury be empanelled to determine the degree of his punishment.
 Roger H. Bedford
Attorney for Defendant
 Wayne Cole
DEFENDANT
Defendant demands a struck jury.
 Roger H. Bedford
Attorney for Defendant"
The State objected to the filing of the above plea and the Court refused to accept said plea. Appellant then refused to plead further and stood mute before the Court and the Court entered pleas of not guilty to the charges laid in the indictment. A trial was had on the not guilty pleas entered by the Court.
The jury returned separate verdicts as to the counts in the indictment finding the defendant guilty of murder in the first degree under each count and fixed his punishment at life imprisonment under each count. He was adjudged guilty of murder in the first degree under each count of the indictment and was sentenced to life imprisonment under each count. He gave notice of appeal and was found to be indigent. He is in this Court with a free transcript and trial counsel was appointed to represent him on this appeal.
This case was tried solely on the evidence presented by the State. Appellant did not testify or offer any evidence in his behalf.
On the late afternoon or early evening of August 28, 1974, appellant went to the home of his father-in-law, James Willard Wilson, in the Blue Springs Community of Franklin County, Alabama, and shot his wife and mother-in-law with a .38 caliber pistol. Appellant's mother-in-law died instantly and his wife died shortly after being carried to the hospital.
The record reflects that appellant and his wife had a very stormy marriage and were constantly in and out of the divorce courts. Divorce proceedings were pending on the *Page 42 
date appellant committed this double murder.
According to the testimony of Mrs. Dovie McAlister, who was the grandmother of appellant's wife, appellant had driven by the house on several occasions on the day of the homicide. He finally stopped and sounded the horn on his automobile. The only people present in the house at this time were Mrs. McAlister, her daughter Fayrene Wilson, her granddaughter Marita Cole, and the one-year-old child of appellant and his wife. Mrs. Wilson and Mrs. Cole were in the kitchen eating dinner and Mrs. McAlister was in the kitchen holding the baby. Appellant's wife asked her mother to go to the door and tell appellant to leave as she did not feel like talking to him. Mrs. Wilson went to the door and gave appellant the message from his wife. Appellant told Mrs. Wilson to tell his wife to come out on the porch and talk to him and he would stop bugging her. Mrs. Wilson told appellant again that his wife did not feel like talking to him. During this conversation Mrs. Wilson was holding the storm door partially open. Appellant then tore the grill work out of the storm door and entered the house. Mrs. Wilson said, "Marita here he comes and he has a gun." Mrs. Wilson went back to the kitchen and Mrs. McAlister carried the baby just inside a bedroom door. While standing in the bedroom door Mrs. McAlister heard a gun fire and there was a short pause and she heard four or five more shots in rapid succession. As Mrs. McAlister turned to leave the bedroom, she came face to face with appellant who stated, "I want my _____ _____ baby," and grabbed the baby out of the arms of Mrs. McAlister and moved at a fast pace toward the front door. Mrs. McAlister ran in the kitchen to see about her daughter and granddaughter. She saw them on the floor in a sitting position between the back door and the refrigerator. She called their names and got no response. She raised their heads at the same time. Her daughter's face was bloody and she was dead. Her granddaughter looked like a half gallon of blood had been splashed on her and her eyes were rolling in her head, but she never uttered a sound.
Mrs. McAlister ran to the telephone to call for help but got the telephone numbers confused and had to give up. She then ran to the front door and started calling for help. She further testified that no threats were made to appellant by anyone, and there were no weapons of any kind in the house. She stated she did not see a weapon in the hands of appellant but that she was not looking for one.
She further testified that she was aware that there had been hard feelings between the Wilson family and the defendant but she was not allowed to state whether she was aware that on two occasions the defendant's father-in-law, James Willard Wilson, had tried to kill the defendant. It should be noted at this point that appellant's father-in-law was not at home when appellant invaded his home and killed his wife and mother-in-law.
Dianne Wilson testified that she was eleven years of age on August 28, 1974, and was living with her parents Mr. and Mrs. James Willard Wilson. She stated that when she came from school on that date, the only people in her home were her grandmother, mother, her sister, Marita Cole, and her sister's baby. That she went next door to see a friend and that her next door neighbors were Mr. and Mrs. J.T. Stanford and they lived right across the road from her house. While she was at the Stanfords, she saw appellant drive up in an automobile. She saw him walk up on the porch and saw her mother talking to him at the front door but she could not hear the conversation. She saw appellant go in her house and heard five or six shots. She stated that appellant was in the house two or three minutes and that she got a glimpse of him when he came back out of the door, and she did not see anything else.
Mr. J.T. Stanford testified that on August 28, 1974, he lived right across the road from the Wilsons and was employed by the State Highway Department. That he got home from work around 4:30 p.m. That *Page 43 
between 4:30 and 5:30 that afternoon he saw appellant drive by the Wilson house. That he had the hood of his son's car up working on the fan belt. While working on the fan belt, he heard a car drive up and stop and then he heard a racket. It was a loud racket and he stepped out from under the hood of the car to see if he could determine where the racket was coming from and at that time he didn't see anything. He walked around to the side of the car and a minute later he heard a shot and then after a pause he heard four or five more shots. He saw a car parked on the Wilson side of the road and described it as being a 1970 or 1971 model Plymouth that was greenish-gold like in color. The next thing he saw was appellant coming out of the house with a baby in his arms and he was kind of running. He saw him go straight to the car and get in and leave. He went south toward Phil Campbell. About that time he saw Mrs. McAlister come out the front door screaming and crying and said something about Marita. He went back in his house and called the ambulance.
Jerry Stanford, son of J.T. Stanford, testified that he was at his father's house on the afternoon of August 28, 1974. He got there around 4:30 p.m. and spent the afternoon and night. That it was nearly sundown when he saw appellant drive up and park in front of the Wilson home and sound his horn. Mrs. Wilson stuck her head out the door and said something to appellant but he did not hear what was said. He heard one shot and in five or six seconds he heard continuous firing and everything got quiet. He saw appellant come out of the house with a baby under his right arm and he had a gun in his left hand and appellant got in his car and left.
He further stated he went in the Wilson home and found Mrs. Wilson and Mrs. Cole lying in a corner. He checked their pulse and Mrs. Wilson was dead. Mrs. Cole was still breathing and he tried to wipe the blood off her face until the ambulance got there. He stated he found one piece of lead behind Mrs. Wilson's back. He picked up the slug and gave it to Rev. Motes who in turn gave it to the Coroner. He was shown State's Exhibit 12 and identified it as the hunk of lead that he picked up from the floor behind Mrs. Wilson's back.
Mr. Joe Newton testified that he was the Coroner of Franklin County and had held this position for eight years. That following a call from the Russellville Police Department he went to the Wilson residence. He stated there were a number of people there when he arrived but the victims had been sent to the hospital. While he was at the Wilson home, he was given a .38 caliber bullet from Rev. David Motes and he gave this bullet to John Kilburn of the crime laboratory of the Department of Toxicology in Florence, Alabama. This bullet was identified as State's Exhibit 12. After leaving the Wilson home he went to the North Alabama Hospital where he observed the victims. That Mrs. Wilson was dead. That he saw Mrs. Cole in the emergency room shortly after 8:00 p.m. and she was alive at that time. Over appellant's objections he was allowed to testify as to the wounds he observed on the body of Marita Cole. He stated there was one wound in the head about two inches above the left eye and one in the left arm that went into the body. He identified State's Exhibit 11 as being a photograph of Marita Cole, showing the wounds he described. He further testified that he examined the body of Mrs. Wilson and she had one wound in the left shoulder that went into the body and another wound in the left chest. He identified State's Exhibits 9 and 10 as photographs of the body of Mrs. Wilson. He identified State's Exhibit 13 as the bullet that came from behind Marita Cole's ear and that he received this bullet at the hospital from Dr. Underwood. He stated he was present the next day when Robert Johnson performed an autopsy on the bodies and that bullets were recovered from each body.
Danny Baxter testified that he was a first cousin to appellant and he saw him around 7:30 p.m. on August 28, 1974, near Haleyville, Alabama, and that he was at his daddy-in-law's house eating supper when *Page 44 
appellant came to the house and called him to come out to his car. Appellant asked him to carry him to another cousin's house, Bennie Earl Phillips, who lived near Winfield, Alabama, which was some 40 miles away. Appellant asked Danny Baxter not to ask him any questions but just to take him to Bennie Earl Phillips' house. Appellant got out at Phillips' house and Baxter left and returned to his house. He stated that appellant did not have the baby with him when he got him to go to Phillips' house.
Dexter Haney, a State Investigator with the Alabama Department of Public Safety, testified that on August 29, 1974, at approximately 2:00 p.m. he went to the home of Bennie Earl Phillips near Winfield, Alabama, with Sheriff Swanson Hindman and District Attorney John Jolly. He stated that Mr. Phillips gave him a .38 caliber revolver with a 2 inch barrel and that it was loaded. The serial number of the pistol was 10870. That he put the pistol in his briefcase and that same afternoon he turned it over to Toxicologist John Kilburn. He identified State's Exhibit 14 as the revolver.
Bennie Earl Phillips testified that he was a first cousin to appellant and that he saw appellant at his home on the night of August 28, 1974. He further testified that appellant took him in one of the bedrooms and told him he "had done something terrible and he wished he hadn't have done what he had done and everything. He said he had shot his wife and mother-in-law." He stated that appellant further said that he was scared and would like to get away, but he didn't know where to go. He said something about going to Florida and Chicago but Phillips told him it didn't make any difference where he went, that sooner or later he would be picked up and that the best thing for him to do was to surrender to the authorities. Appellant had his pistol in a black holster and he left it in the bedroom and got in the car with Phillips who drove him back to Franklin County. He let appellant out in the vicinity of his home and appellant asked him to go to Tim Murphy's house and call a lawyer about turning himself in. Phillips did as requested and reported to appellant that the lawyer said to meet him the next morning and he would go with him to surrender. Phillips identified State's Exhibit 14 as appellant's pistol.
Robert B. Johnson testified that he was a State Toxicologist stationed in Birmingham and had been a Toxicologist for over 19 years. Defense counsel admitted Mr. Johnson's professional qualifications as a Toxicologist, but the District Attorney wanted to prove his qualifications anyway and was allowed to do so by the trial judge. He stated that he had performed between 1,600 and 1,700 autopsies since he had been a Toxicologist.
Mr. Johnson gave a detailed account of the autopsies that he performed on both victims and made photographs of each victim during the autopsies and illustrated these photographs to the jury showing the wounds on their respective bodies. Over objections of appellant these photographs were admitted in evidence. No useful purpose can be served in reciting the details of what Mr. Johnson found during these autopsies. Suffice it to say that it was Mr. Johnson's opinion that both victims died as a result of the gunshot wounds inflicted upon them by appellant during the shootings. He testified initially that he recovered a total of three bullets from the bodies and turned them over to Mr. John Kilburn who was director of the laboratory in Florence. Mr. Johnson later stated he was not certain whether it was a total of two or three bullets. He found no powder marks on the bodies which would indicate to him that all shots were fired from a distance of more than one or two feet.
Mr. John Kilburn testified that he was employed as a Laboratory Director with the Alabama Department of Toxicology and Criminal Investigation and had been so employed for six years. The State proved his education, background and experience in making ballistic tests, examinations and comparisons to determine if a particular gun fired a particular bullet. He stated he had made several hundred such tests. He *Page 45 
further testified that he was present during the autopsies performed by Mr. Johnson and received from him the bullets identified as State's Exhibits 15 and 16. He also testified that he received State's Exhibits 12 and 13 being other bullets from the Coroner. He stated that the ballistic tests performed by him proved that State's Exhibit 14, appellant's .38 caliber pistol, was the same pistol which fired the bullets removed from the bodies of the victims. He further identified appellant's pistol as being a "38 caliber Special Miroku revolver bearing serial number 10870 that was given to me by State Investigator Dexter Haney on August 29, 1974." The pistol and bullets were admitted in evidence over appellant's objections.
Glen Demastus, Chief of Police of Phil Campbell, testified that on July 27, 1974, the Sheriff turned over to him a child custody warrant to serve on appellant. This child custody warrant was in connection with the divorce proceedings then pending between appellant and his wife. When appellant was served with this warrant, he told the Chief of Police, "I'm going to kill the whole bunch."
Appellant proposed to show that on two prior occasions appellant's father-in-law had attempted to kill him or threatened to do so — one time before appellant and his wife were married and the other time was subsequent to their marriage.
The Court asked the witness at the time he served the warrant "was there any conversation at this time concerning somebody shooting at somebody else?" The witness answered, "No sir."
The Court asked the witness if there was any conversation concerning difficulties between Willard Wilson and the defendant and the witness answered that he didn't recall any at all.
The sufficiency of the evidence in this case is not presented for review. There was no motion to exclude the State's evidence on the ground the State failed to make out a prima facie case; there was no motion for a new trial; there was no request for the affirmative charge, and there were no adverse rulings of the trial court on the admission of evidence which contained any merit. Eady v. State, 48 Ala. App. 726,267 So.2d 516; Price v. State, 53 Ala. App. 465, 301 So.2d 230; Mosley v.State, 54 Ala. App. 59, 304 So.2d 613; Tally v. State,54 Ala. App. 34, 304 So.2d 275.
Appellant complains that the trial court was in error in not ordering a mental examination of him prior to trial. We have pointed out that appellant did not press for a ruling on his motion in this regard. Review on appeal is limited to those matters on which rulings are invoked at nisi prius. Frazier v.State, 53 Ala. App. 492, 301 So.2d 256; Richardson v. State,50 Ala. App. 574, 281 So.2d 286.
Appellant contends that the trial court committed reversible error in not allowing him to show prior difficulties between him and his father-in-law. We do not agree. It is settled law that evidence of prior difficulties as part of the chain of events leading up to the killing is admissible when offered by the State but when offered by the defendant, such evidence is admissible only if the defendant was not the aggressor in the difficulty resulting in the killing and if the defendant has offered some evidence tending to show self-defense. Foreman v.State, 50 Ala. App. 236, 278 So.2d 238; Byrd v. State, 257 Ala. 100, 57 So.2d 388; Sanders v. State, 242 Ala. 532, 7 So.2d 483.
There was not the slightest evidence of self-defense in this case. That the appellant was the aggressor cannot be successfully gainsaid. He invaded the home where the victims were eating supper and shot down two defenseless women. This was a double murder, and a cold-blooded one without any mitigating or extenuating circumstances. After the shooting he kidnapped his baby and took flight to another county.
Appellant relies on the recent case of Sashington v. State,56 Ala. App. 205, 325 So.2d 205. We have carefully read this case *Page 46 
and find that it fully supports the conclusion we have reached herein.
Photographs of the victims and the locus in quo are admissible in murder prosecutions when they shed light upon the character and location of the wounds on the victims' bodies and when the proper predicate has been laid. Hurst v. State,54 Ala. App. 254, 307 So.2d 62; Snow v. State, 50 Ala. App. 381,279 So.2d 552; Boulden v. State, 278 Ala. 437, 179 So.2d 20.
The pistol used by appellant to kill the victims and the bullets removed from the bodies were properly admitted into evidence. Alabama Digest Criminal Law, 404 (4).
Appellant contends that the trial court erred in not granting a mistrial because of the prejudicial remarks of the District Attorney in his closing argument. The remarks complained about appear on page 102 of the record and are as follows:
 "OBJECTIONS BY ROGER BEDFORD TO ARGUMENT OF JOHN JOLLY:
 "MR. JOLLY: Whatever they might have done, and we haven't heard anything that they had done anything to him _ _ _
 "MR. BEDFORD: At this time, I object to that statement by the District Attorney about we have not heard something and that is the third incident or the second that I considered to be a direct comment on the failure of the accused to take the stand and we move for a mis-trial.
 "THE COURT: Well, I overrule the motion for a mis-trial, but I will sustain the objection, the use of that term in that I think that it is better not to use it.
 "MR. JOLLY: The people of this County need protection from this kind of an individual. We know what he has done once, what will he do after a sentence of 10 years? What other kind of encouragement could Wayne Cole have in a light sentence like that?
 "MR. BEDFORD: We object to that portion of the District Attorney Argument in which he argues we don't know what Wayne Cole would do after a sentence of ten years.
 "THE COURT: Ladies and Gentlemen, disregard that portion of the District Attorney's Argument."
The first remark cannot be construed as a direct reference to the failure of appellant to testify. As a matter of fact it makes no reference to appellant at all. In the context of the language used we cannot say what the District Attorney was alluding to. The trial court sustained appellant's objections anyway and there is nothing for this Court to review.
As to the second remark the trial judge sustained appellant's objection and charged the jury to disregard that portion of the District Attorney's argument. No error intervened here.
See Embrey v. State, 283 Ala. 110, 214 So.2d 567; Fletcher v.State, 52 Ala. App. 303, 291 So.2d 757; Hawes v. State,48 Ala. App. 565, 266 So.2d 652.
Finally appellant urges this Court to hold that the trial court was in error in not accepting his written plea of guilty to murder in the second degree and he relies on Title 15, Section 277, Code of Alabama 1940, as last amended.
District Attorneys are constitutional officers, Amendment 226, Constitution of Alabama 1901, and their duties are prescribed by statute. Title 13, Section 229, Code of Alabama 1940. One of the duties so prescribed is "To draw up all indictments and to prosecute all indictable offenses."
The grand jury of Franklin County indicted appellant on two counts of murder in the first degree and it thus became the duty of the District Attorney to prosecute appellant on that indictment. He objected to appellant's plea of guilty to murder in the second degree and this he had a right to do. The Court sustained that objection and when appellant declined to plead further but stood mute the Court entered a plea of not guilty for him. This the Court was under a duty to do. Title 15, Section 276, Code of Alabama 1940. *Page 47 
There had been no plea bargaining and appellant sought to compel the State to accept his plea of guilty to murder in the second degree and thus control the disposition of the cases against him. We have not been cited to a case, nor has our research revealed one, that gives a defendant the power to control the disposition of a criminal case pending against him. We hold that a defendant has no such power. A defendant cannot compel the State to accept a guilty plea to a lesser included offense any more than he can compel the State to consolidate multiple indictments against him and have one trial. Hopkins v.State, 54 Ala. App. 75, 304 So.2d 629.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
TYSON, DeCARLO and BOOKOUT, JJ., concur.