TYSON, Judge.
Kenneth Wesley Dickerson was charged by indictment with the first degree murder of one James Cleo Bishop. The jury found the appellant “guilty as charged,” and fixed punishment at life imprisonment in the penitentiary. The trial court entered judgment in accordance with this verdict.
William L. Allen, Jr., Acting Coroner of Jefferson County, testified that he investigated a death at 8702 Third Avenue North in Birmingham, Alabama, on February 17, 1976. Allen stated that an autopsy was performed on one James Cleo Bishop at the East End Hospital by Jay M. Glass. Allen indicated that he was present during the. autopsy and that Bishop died as a result of a gunshot wound to the chest. Allen testified that the gunshot wound was not a contact wound [i. e., the muzzle of the gun was not in contact with deceased’s body at the time the fatal shot was fired].
Jay M. Glass testified that he was employed by Cooper Green Hospital in the Department of Pathology. Glass stated that he performed an autopsy on one James Cleo Bishop on February 18, 1976. The cause of death was due to internal bleeding as the result of a gunshot wound in the chest.
James Jerome Hartley testified that James Cleo Bishop was his wife’s uncle. Hartley related that on February 17, 1976, he was at Bishop’s residence. Hartley indicated that he arrived at Bishop’s residence around 5:40 p. m. According to Hartley, someone called Bishop on the telephone, and then ten to fifteen minutes later the appellant drove up in front of Bishop’s house near the driveway. Hartley testified that Bishop’s children came inside the house and talked with Bishop. Hartley indicated that he went outside and observed the appellant in the front seat of an automobile on the passenger side near the driveway. According to Hartley, appellant’s ex-wife was behind the steering wheel.
Hartley stated that the barrel of a gun was sticking up out of the front window on the passenger side of the car near the area where the appellant was seated. Hartley testified that the car doors were closed but the window on the right front side was down. According to Hartley, he shook hands with the appellant, who then told Hartley that Bishop had called his wife a “spick” over the telephone and that he was going to kill him (R. p. 47). Hartley related that about that time Bishop suddenly walked up from behind on his left hand side. Hartley testified that the shotgun was in appellant’s lap and that the appellant had his hand over the trigger with the barrel sticking out of the window. According to Hartley, Bishop “bumped him” from behind as he walked up to the car, so Hart-ley quickly pushed him back from the car to keep the two of them separated. Words were being exchanged. Hartley stated that as he pushed Bishop away from the car his own back was turned to the appellant. At this time, according to Hartley, the shot was fired, which struck Bishop. Hartley testified that he turned back around toward the appellant and saw the gun sticking out the window of the car. Hartley then grabbed the gun and threw it down on the ground very hard. Hartley, Dickerson, and appellant’s ex-wife then went into the house and called the police. Hartley testified that he then went back outside with the appellant who attempted to give mouth to mouth resuscitation to Bishop. Hartley indicated that Bishop did not have a weapon and that Bishop never touched the shotgun.
Donna Marlene Lacey testified that she lived at 8700 Third Avenue North on February 17,1976. Mrs. Lacey stated that James Cleo Bishop lived next door. According to Mrs. Lacey, she was on her front porch grilling a steak around 5:45 p. m. that evening. Mrs. Lacey testified that an automobile drove up near Bishop’s driveway about that time this same evening. Mrs. Lacey stated that the driver was a woman and that there was another person on the passenger side in the front seat. According to *1047 Mrs. Lacey, there was a child on the front porch of Bishop’s home. Mrs. Lacey testified that she was twelve feet from appellant’s automobile. Lacey stated that she heard a male voice call to the child to “go inside and get his God-damned mother and father.”
According to Mrs. Lacey, Hartley then came outside a few minutes later and went to appellant’s car. Hartley and the appellant, Kenneth Dickerson, talked about someone calling someone’s wife a name. Mrs. Lacey testified that she could not see Hartley or the passenger in the car due to a column obstructing her vision. Mrs. Lacey stated that Bishop came out a short time later. After that there was a gunshot.
Darrell Robert Bishop testified that on the afternoon in question he was out in the yard playing with his sister and his cousin (Hartley’s child). Bishop stated that he was the son of James Cleo Bishop, the deceased. Bishop indicated that the appellant and a woman drove up near his driveway that afternoon and that the appellant told the children to go inside and get their “chicken s_daddy” (R. p. 155). Bishop testified that all of the children, including himself, went inside and talked to his father and Hartley. Bishop then went to the storm door and looked outside through the window. He stated that he saw Hartley talking with the appellant and that the tip of a gun was sticking out of the car window on the passenger side of the front seat. Young Bishop testified that his father, about five minutes later, walked up behind Hartley and sort of pushed him from behind. According to Bishop, Hartley pushed his father back away from the car at which point a shot was fired. Bishop stated that he never saw his father put his hands on the gun. •
Deborah Bishop, daughter of the deceased, testified that around 5:30 p. m. on February 17, 1976, the appellant drove up near the driveway of their home. According to Miss Bishop, the appellant told her and her brother to get their “chicken s_ daddy” (R. p. 175). Miss Bishop related that she and her brother then went inside and talked with Hartley and her father. Miss Bishop testified that Hartley went outside and four to five minutes later her father walked outside near the car.
William J. Thomas, a police officer with the City of Birmingham, testified that on February 17, 1976, he went to 8702 Third Avenue North at around 5:55 p. m. Thomas stated that by the time he had arrived the ambulance had left with the body of the deceased. Thomas indicated that he took the appellant into custody and searched him. Thomas testified that he found two .410 gauge shotgun shells in appellant’s pocket which he turned over to Officer Crocker, an evidence technician. Thomas stated that he turned the appellant over to Detective Sergeant Gaut.
William T. Gaut, Detective Sergeant with the Birmingham Police Department, testified that he went to 8702 Third Avenue North on February 17, 1976. Gaut indicated that he arrived at this address around 6:00 p. m. He observed the appellant in the back seat of Officer Thomas’ patrol car. Gaut testified that he did not threaten, intimidate, coerce, or abuse the appellant in any way, nor did he offer any remuneration or hope of reward in order to obtain a statement. He informed the appellant of his “Miranda rights.” Then, Gaut indicated that the appellant stated that he understood his rights, but still wished to make a statement. Gaut testified that he and the appellant were the only persons in the patrol car.
Richard Keith Crocker, an evidence technician with the Birmingham Police Department, testified that he went to 8702 Third Avenue North on February 17, 1976, at around 6:23 p. m. Crocker stated that he found a shotgun at the scene between the sidewalk and the street in front of Bishop’s home. According to Crocker, the shotgun was in the same condition at trial as it was when he found it at the scene. Crocker stated that he checked the shotgun in with the front desk (i. e., property control room) and that the weapon remained there until the day before trial when he checked it out. Also, Crocker testified that he found a *1048 spent Revelation brand, five shot, .410 gauge, hull inside the shotgun which had been fired.
The appellant’s motion to exclude the evidence was overruled.
Mrs. Kenneth Dickerson, the appellant’s ex-wife, testified that she and the appellant had a conversation on the afternoon of February 17, 1976, concerning a telephone conversation between the appellant and another person. Mrs. Dickerson stated that she and the appellant got in the car and that she drove, but did not know where they were headed. After driving for a while, the appellant told her that Bishop had called her a name and that they were going to his home to get an apology. When they arrived at Bishop’s residence; she parked the car near the driveway, and the appellant told a young child in the front yard to “go inside and get his mother and father.” Mrs. Dickerson stated that when she and her ex-husband got in their car at their home she did not notice a shotgun, but she did notice this while they were driving toward the Bishop’s home. Mrs. Dickerson related that Hartley came out of Bishop’s home about five minutes after the young child went inside. Mrs. Dickerson stated that her husband shook hands with Hartley and then told Hartley that Bishop had called his ex-wife a name and that he wanted an apology. Mrs. Dickerson testified that her husband gripped Hartley’s hand with his right hand and pointed to her with his left hand. She stated that Bishop suddenly walked up to the passenger side of the car, reached in, and slapped the appellant. After Bishop had reached inside the car, according to Mrs. Dickerson, the shotgun fired. Mrs. Dickerson stated that she heard her husband say, “You gripped the gun” [R. p. 256]. Then somebody grabbed it and threw it on the ground.
On cross, Mrs. Dickerson admitted that she and her ex-husband were divorced and that he had been drinking on the date in question. She also testified that while she saw Bishop strike her husband and shake him she did not see Bishop take hold of the shotgun. Mrs. Dickerson then stated that after the shotgun fired, Hartley grabbed it and threw it on the ground,
Kenneth Wesley Dickerson, the appellant, testified that on February 17, 1976, Bishop called him on the telephone. During the telephone conversation appellant stated that Bishop called his ex-wife a “spick” and said that he would “blow both his and his ex-wife’s heads off.” Dickerson indicated that they went over to Bishop’s home to ask for an apology. The appellant testified that he took his shotgun because of “numerous threats” he had received from Bishop in the “past three years.” The appellant indicated that he had had one or two drinks of whiskey and three or four beers that evening before leaving. After arriving at Bishop’s home, Dickerson stated, he told a young child “to go inside and get his mother and father.” Dickerson testified that the stock of the shotgun was on the floorboard of the car between his right leg and the door. According to the appellant, Hartley came outside and walked up to the passenger side of the car where he and the appellant shook hands and exchanged greetings, after which the appellant introduced Hart-ley to his ex-wife. It was while the appellant was shaking hands with Hartley that Bishop suddenly appeared, reached in, and slapped him. Dickerson testified that Bishop grabbed the barrel of the shotgun, shook his hand, and the gun then fired. At this point Hartley then grabbed the shotgun and threw it to the ground. On cross, the appellant admitted having had an affair with Bishop’s wife over the past several years and had sexual relations, though he had never mentioned this to anyone.
The State was allowed over objection by the defense to have the appellant demonstrate how the safety mechanism on the shotgun operated. Such demonstration showed that when the shotgun was in an upward position one would have to hold the safety in the “off” position and simultaneously pull the trigger in order to discharge the gun. The appellant stated that such defect in the safety mechanism did not exist before February 17, 1976. On cross-examination the appellant admitted having *1049 had a telephone conversation with Mildred Weems, the mother of deceased’s wife, on May 9, 1976. When asked if, during this conversation, he told Mrs. Weems that he wished she had been in the line of fire so that he could have gotten her when he got Bishop, the appellant responded that he did not. On re-direct the appellant stated that on the times he had fired the shotgun before February 17, 1976, the safety mechanism was not defective.
Mildred Weems, the mother of Anita Bishop (wife of deceased), was called in rebuttal and testified that she received a phone call from the appellant on May 9, 1976, at 8702 Third Avenue North. Mrs. Weems stated that during the telephone conversation the appellant told her that “he wished she had been in the line of fire so he could have gotten her when he got Bishop” [R. p. 317].”
William T. Gaut, Sergeant with the Birmingham Police Department, testified that he found the shotgun in Bishop’s front yard. in an area consisting of dirt and grass. Also, there were no traces of grass, rock, or any other foreign substance on the shotgun.
David L. Higgins of the Birmingham Police Department’s Bureau of Scientific Investigation gave his qualifications as an expert on firearms. Higgins stated that he had examined the .410 Revelation Manufacturer, bolt action, single shot shotgun owned by the appellant. Higgins testified that the safety mechanism on the shotgun was defective in that when the gun is in an upright position the safety has to be held forward in order to fire the weapon.
The defense then recalled the appellant. He admitted that he did have a conversation with Mildred Weems on May 9, 1976. According to the appellant, Anita Bishop placed the call to his residence and when he answered the phone Mrs. Weems got on the line. Dickerson testified that Mrs. Weems called him harsh names. He denied making any statement to Mrs. Weems to the effect that he wished she had been in the line of fire so he could have gotten her also.
I
The appellant contends that since he was charged with a “capital offense,” under Ex parte Bynum v. State, 294 Ala. 78, 312 So.2d 52, he was entitled to strike from a venire of thirty-six jurors.
This Court in Fisher v. State, 57 Ala.App. 310, 328 So.2d 311, cert. denied 295 Ala. 401, 328 So.2d 321, specifically rejected this argument. Judge Bookout, speaking for this Court, in Fisher stated:
“Contrary to the broad language employed by the Supreme Court in Bynum, we are of the opinion that the Court was addressing itself solely to the question of bail. The purpose for a special venire in ‘capital cases’ was to give a defendant, on trial for his life, an additional safeguard not given to those where only their liberty was at stake. At the time Act No. 532, supra, and Title 30, § 63, Code of Alabama 1940, were enacted, the only distinction between ‘capital’ and ‘non-capital’ cases was the possible imposition of the death penalty. Since the imposition of the death penalty has been suspended, there is no rational justification for a special venire in a case formerly classified as ‘capital’ where the maximum punishment is now the same as in a ‘non-capital’ case.”
See also Killough v. State, Ala.Cr.App., 332 So.2d 736, cert. denied, Ala., 332 So.2d 739; Spears v. State, 57 Ala.App. 525, 329 So.2d 579, cert. denied, 295 Ala. 420, 329 So.2d 582.
II
The appellant contends that the trial court committed reversible error by not allowing the appellant to show prior difficulties which occurred during the past three years between himself and the deceased, Bishop, not only to negate the existence of malice and to shed light on his intention of arming himself, but also as bearing on the question of self-defense.
The appellant relies upon this Court’s opinion in Sashington v. State, 56 Ala.App. 698, 325 So.2d 205, cert. denied, 295 Ala. *1050 416, 325 So.2d 211, and the authorities therein cited, in support of his position.
The State counters by citing this Court to the case of Cole v. State, Ala.Cr.App., 337 So.2d 40, cert. denied, Ala., 337 So.2d 47.
Judge Harris in Cole, supra, noted that there was not the slightest evidence of self-defense. Cole invaded the home of his victims while they were eating supper and shot down two defenseless women. He then kidnapped his child and fled to another county.
The facts in the case at bar are much more closely related to the cause in Sash-ington, supra.
The colloquy wherein the appellant maintained reversible error is as follows (R. pp. 269-273):
“Q. Let me just direct your attention to the date of February 17, 1976, and ask you if prior to that date there had been any difficulties between you and Mr. Bishop?
“A. Yes, there had.
“Q. And, over how long a period of time had there been difficulties between you and Mr. Bishop?
“MR. BLACK: Your Honor, I am going to object to this line of questioning at this time, unless the proper predicate for it has been laid.
“THE COURT: Well, you speak of difficulties, I don’t, don’t know what you are talking about, I am going to sustain objection to that at this time. But let me say this, Mr. Mills, of course, I am aware, I’ll withdraw that, just go ahead.
“MR. MILLS: If the Court, please, I would like to make an offer about that.
“THE COURT: All right, ladies and gentlemen, y’all can go back into the jury room, let me find out what the purpose of this is.
“(WHEREUPON, the jury was excused to the jury room at 10:55 a. m., and in open court, out of their presence and hearing, the following proceedings were had and done:)
“MR. MILLS: If the Court, please, the defendant offers to prove, and intends to prove, a series of difficulties between the deceased and the defendant over about a three year period, including threats on the defendant’s life by the deceased including actual overt attempts at violence including firearms on the defendant’s life. Offering it for several purposes, I think it would be .
“THE COURT: That’s what I would be interested in knowing, what your purposes, because, of course, it doesn’t so far construe any evidence here which would be tended to prove self-defense, so, go ahead and .
“MR. MILLS: I think it would illuminate the circumstances. There have been a lot of attempts by the State to show bad feelings between the deceased and the defendant and I think it helps to illuminate those circumstances, and secondly, I think it is pertinent on the issue of why the defendant was armed on the occasion complained of. I think the law would take into consideration the fact that threats had been made and that overt attempt had been made including the use of firearms against this defendant as having a bearing on why he armed himself on this occasion. I think there are cases that would support that.
“THE COURT: Generally it would be the ruling of the Court that there is not, of course, any evidence here from the standpoint at this stage, sufficient at the standpoint of self-defense to permit this to go in as to the question of who was the aggressor and making it proper to act more quickly and that sort of thing under the circumstances, and where you have set of facts where this defendant, into evidence up to this point, went to the home of the deceased with a gun and called him out, the Court is of the opinion that this does not raise any of the particular privileges to go into this type of testimony or rights that is raised by the defense, so I do sustain objection to this type of evidence and rule that it is not permissible to go into it at this point, any question of bad feeling between them or prior difficulties between them, between the deceased and the defendant.
*1051 “MR. MILLS: If the Court, please, so I make my position advisedly, I offered not only on the question of self-defense, but also on the issue of the right of a person to apprehend danger to himself from past occurrences.
“THE COURT: I understood your objection and I thought I was ruling on all things in your objection, and I merely mentioned the self-defense even though you didn't raise it because I wanted it understood that that was my construction of that, and dispose of it, but then I did after that — and I do rule against you on the other reasons that you assigned for it.
“MR. MILLS: Well, I offer and I cite the court’s case of Sessington against State, 325 So. 2nd.
“THE COURT: What, what were the ■factual circumstances and what does that hold?
“MR. MILLS: Well, it holds that a defendant not claiming self-defense is entitled to prove that a person present at the place where a shooting occurred had shot at him on a previous occasion to explain why he had a gun on that occasion, and to negative the existence of intent or malice.
“THE COURT: Was this a circumstance " where the defendant had armed himself and gone to the deceased’s home to have it out with him on some sort, there was some sort of disagreement or misunderstanding?
“MR. MILLS: It was an occasion, as I recall, of a party where both were present.
“THE COURT: I see, I still, in short, my ruling is the same. Notwithstanding the case that you cite.
“Is there anything else on this, now, before I bring the jury back in?
“MR. MILLS: No, sir, we except to the Court’s ruling.
“THE COURT: All right.
“Put the jury in the box.”
This same error, it is asserted, also occurred during the direct examination of the appellant, as follows (R. pp. 276-278):
“Q. Were you familiar with that shotgun before that date?
“A. Not familiar, I was only .
“Q. How long had you had it?
“A. Ummm, no more than six months, if that long.
“Q. Had you ever shot it?
“A. One time.
“Q. When was that?
“A. That was the day after I purchased it.
“Q. All right, it was not a new gun when you purchased it?
“A. No, sir, it wasn’t.
“Q. All right, what was your intention or you purpose in putting the shotgun in the car?
“A. Well, I had been threatened by him on numerous occasions.
“MR. BLACK: Your Honor, I object to that.
“THE COURT: Let me say this. Of course, we get into the question of motive where you have different types of motive for doing things and for not doing things and the cases that are ruling on the point of motive are numerous.
“I’ll overrule objection, I’ll let him.
“MR. BLACK: Your Honor, I object to the witness’ response to the question as being unresponsive and going back into something which Your Honor has already ruled on.
“THE COURT: I know what it, I understand what it was he was about to say, but coming up now rather than as it came up before, I did overrule objection that you just made. I am not going to argue with you anymore about it, John. Go ahead.
“MR. MILLS: All right, you may answer the question. Do you need the question repeated?
“A. If you would.
“THE COURT: Let the court reporter read it.
“COURT REPORTER: What was the purpose or intention of having the shotgun in the car?
“A. Because of numerous threats.
*1052 “Q. By whom?
“A. From Mr. Bishop.
“Q. Toward whom?
“A. To me.
“Q. Over how long a period of time had you received such threats from Mr. Bishop?
“MR. BLACK: Your Honor, I object to this line of questioning, again. We have gone past what his purpose was for doing something and we are getting back into something which, I believe, Your Honor has ruled on.
“THE COURT: What was the question?
“MR. MILLS: The question was, what period of time these threats had been made.
“THE COURT: I sustain objection.
“MR. MILLS: If the Court, please, without repeating we make the same offer of proof we previously made if we may just do that without going back?
“THE COURT: Yes, sir, you may and I’ll overrule your, I mean I sus-, do you object to it?
“MR. BLACK: Yes, Your Honor.
“THE COURT: I sustain objection to the offer that you made.
“MR. MILLS: (Continuing) All right. Mr. Dickerson, I believe there has been some testimony about you, the smell of alcohol on your breath. Had you had anything to drink that afternoon?
“A. Yes, sir, I had.
“Q. Were you intoxicated?
“A. No, sir.
“Q. What had you had to drink?
“A. Oh, I would, I had about one or two drinks of whiskey and three or four beers.
“Q. Over a course of what period of time?
“A. Umm, hours.
“Q. Hours? Were you working that day?
“A. No, sir.
“Q. That was your day off?
“A. I was off that day.”
In our careful examination of this record, it is clear that a telephone conversation took place on the afternoon of February 17, 1976, between the appellant, Dickerson, and the deceased, Bishop. In this conversation harsh words were exchanged. The appellant and his former wife each testified that she was of Spanish origin, and the deceased had called her a “spick,” a term very derogatory of persons of such blood. They then drove to the front of the deceased’s home, and directed his children to go inside and ask the deceased and his wife to come outside. A few minutes thereafter Hartley, a relative of Mrs. Bishop, came outside and began a conversation with Dickerson, the appellant. At this point the evidence is in conflict. Hartley maintained that he had ceased shaking hands with the appellant and had turned to push Bishop, who suddenly appeared, when the shotgun went off. The next door neighbor, Mrs. Lacey, could not see this occurrence because her view was obstructed by a porch column. The ex-wife, Mrs. Dickerson, and the appellant each related that, while Hartley and Dickerson were still shaking hands and Dickerson was pointing to his ex-wife, explaining the telephone conversation, Bishop suddenly appeared. According to Dickerson the gun was not in his lap, but the stock was on the floorboard of the car, and Bishop reached in and slapped him. Dickerson also related that Bishop shook. his hand or arm as he reached down and the gun suddenly went off.
All parties concede at this point that Hartley turned back toward the automobile, seized the shotgun by the barrel and threw it to the ground roughly.
Dickerson also contended that in the telephone call, Bishop, the deceased, threatened him.
In reviewing a number of authorities in Sashington, supra, Judge Leigh Clark states the applicable law in this manner:
“The rule to the effect that ordinarily evidence of a previous difficulty between defendant and deceased, or between defendant and a third party related to deceased, or connected with the fatal incident, in any homicide case, or a case of assault with intent to murder, is not ad *1053 missible if there is no evidence of self-defense, or if the evidence shows conclusively that defendant was the aggressor thereby negating self-defense as a matter of law, is not controlling in a case, of this kind, wherein defendant’s defense is not based upon a claim of self-defense. Even if defendant had claimed that the shooting was in self-defense, this would not preclude him from showing that the offense was committed under circumstances reducing it to manslaughter. Reeves v. State, 186 Ala. 14, 65 So. 160 (1914); Byrd v. State, 257 Ala. 100, 57 So.2d 388 (1952). It necessarily follows that in a case in which he does not even claim self-defense he should not be precluded from showing the absence of any one or more of the elements constituting each degree of homicide charged in the indictment, including particularly intention and malice. The question of the admissibility of evidence as to a previous difficulty with deceased or others in homicide cases usually arises in connection with claims of self-defense and is usually determinable by considerations relative to such a claim. But this is not always true. In Byrd v. State, supra, the court concluded that there was not sufficient evidence of self-defense to justify proof by defendant of prior difficulties. Even so, the court went on to state:
“ ‘So far we have been dealing with the relevancy of proof offered by the defendant of prior difficulties and of the wounds suffered by him with respect to self-defense, but this evidence must now be considered from a different viewpoint.’ “And thereafter the court held that the defendant should have been allowed to show physical and emotional injuries received by him in the prior difficulties on the issue of whether defendant was acting under the heat of passion at the time of the shooting by reason of continuing pain from injuries suffered by him.”
If the appellant could present evidence' that he had been threatened, or shot at by Bishop, he should have been allowed to do. so. Such evidence may not have been sufficient to generate a reasonable doubt in the minds of the jurors of the existence of intent or malice on the part of Dickerson, but it was of such a nature as to have had an important bearing on such issues. Instead of arming himself to “take the life of his victim,” such prior threat might well have established Dickerson’s reason as being to negate the existence of malice or a specific intent to kill on his part. In all ■events, we are clear to the conclusion that under the facts of this case such evidence should have been admitted by the trial court.
For the error shown in the refusal of this evidence, we must reverse and remand this cause.
REVERSED AND REMANDED.
DeCARLO, BOOKOUT and BOWEN, JJ., concur.
HARRIS, P. J., concurs in the result only.